**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Meitav Provident and Pension Funds Ltd. and Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| HARSH PATEL, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SNOWFLAKE INC., FRANK SLOOTMAN, and MICHAEL P. SCARPELLI,<br><br>Defendants. | **Case No. 3:26-cv-01613-JD (<u>Consolidated</u>)**<br><br>Case No. 3:26-cv-04869<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

Page(s)


I. INTRODUCTION ........ 1

II. JURISDICTION AND VENUE ........ 6

III. THE PARTIES ........ 7

A. Plaintiffs ........ 7

B. Defendants ........ 7

IV. BACKGROUND ........ 7

A. Company Background ........ 7

B. By the Start of the Class Period, Trouble Was Emerging at Snowflake ........ 9

V. DEFENDANTS MISLED INVESTORS TO BELIEVE THAT SNOWFLAKE'S BUSINESS WAS NOT BEING NEGATIVELY IMPACTED BY EFFICIENCY GAINS, ICEBERG TABLES MIGRATIONS AND DISCOUNTED STORAGE PRICING, WHEN IN FACT IT WAS ........ 10

A. Technological Efficiencies, Adoption of Iceberg Tables and Discounted Storage Pricing Negatively Impacted Consumption and Storage Trends ........ 11

B. Defendants Misled Investors To Believe That Consumption Was Not Suffering from More Efficient Processing, Iceberg Tables Migrations and Discounted Storage Pricing ........ 15

C. Defendant Slootman Was Dumping His Shares and Secretly Planning Retirement ........ 18

D. When the Truth About Threats from New Efficiencies, Competitive Pressure from Iceberg and Discounted Storage Pricing Was Revealed, Investors Suffered Severe Losses ........ 19

VI. DEFENDANTS MISLED INVESTORS TO BELIEVE THAT SNOWFLAKE'S CYBERSECURITY PROGRAM EFFECTIVELY MITIGATED CYBERSECURITY RISKS, AND THAT ITS PLACING RESPONSIBILITY ON CUSTOMERS TO MANAGE ACCESS CREDENTIALS DID NOT MAKE THE PROGRAM VULNERABLE ........ 21

A. Snowflake's Cybersecurity Program Assigned Responsibility for Securing Access Credentials to Customers, Which Created a Massive Security Risk ........ 21

B. Defendants Misled Investors to Believe That Snowflake's Cybersecurity Program Managed and Mitigated Cybersecurity Risks, and That Its Placing Responsibility on Customers to Manage Access Credentials Did Not Make the Program Vulnerable ........ 22

C. When the Heightened Risk of Cybersecurity Attacks on Client Data Materialized, Investors Suffered Losses ........ 24

VII. MISLEADING STATEMENTS ........ 26

A. June 26, 2023 Statement in *Business Insider* (Misstatement 1) ........ 26

B. August 23, 2023 Conference Call (Misstatement 2) ........ 26

C. August 31, 2023, Q2 2024 10-Q (Misstatement 3) ........ 27

D. August 31, 2023, Q2 2024 10-Q (Misstatement 4) ........ 27

E. August 31, 2023, Q2 2024 10-Q (Misstatement 5) ........ 28

F. December 1, 2023, Q3 2024 10-Q (Misstatement 6) ........ 28

G. December 1, 2023, Q3 2024 10-Q (Misstatement 7) ........ 29

H. December 1, 2023, Q3 2024 10-Q (Misstatement 8) ........ 29

I. March 26, 2024, 2024 10-K (Misstatement 9) ........ 30

VIII. LOSS CAUSATION ........ 30

A. February 28, 2024 ........ 31

B. May 30, 2024 ........ 32

C. June 10, 2024 ........ 32

IX. ADDITIONAL SCIENTER ALLEGATIONS ........ 32

A. Defendant Scarpelli Has Admitted That He Followed Consumption on a Daily Basis ........ 32

B. Defendants Have Admitted That They Knew by August 2023 or Shortly Thereafter That Discounted Storage and the Availability of Iceberg Tables Were Negatively Impacting Revenue ........ 33

C. Defendants, the Board of Directors, and Senior Management Received Regular Reports on Cybersecurity Risks and Countermeasures ........ 34

D. Defendant Slootman Sold $223 Million of Stock Over 46 Days in Months Before the Disclosures at Issue ........ 35

E. Knowing and Addressing Grave Threats to the Business Is a Core Operation of Snowflake ........ 36

X. CLASS ACTION ALLEGATIONS ........ 38

XI. PRESUMPTION OF RELIANCE ........ 39

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........ 40

COUNT I For violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants) ........ 40

COUNT II For violation of Section 20(a) of the Exchange Act (Against the Individual Defendants) ........ 42

XIII. PRAYER FOR RELIEF ........ 43

XIV. JURY DEMAND ........ 44

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **API** | Application Programming Interface |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **Class Period** | All persons and entities other than Defendants who purchased or otherwise acquired Snowflake stock between June 26, 2023 and June 10, 2024, both dates inclusive |
| **Company or Snowflake** | Snowflake Inc. |
| **Defendants** | Snowflake Inc., Frank Slootman and Michael P. Scarpelli |
| **DDL** | Data Definition Language |
| **DML** | Data Manipulation Language |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FE** | former employee |
| **FY** | Fiscal year |
| **Individual Defendants** | Frank Slootman and Michael P. Scarpelli |
| **Lead Plaintiff or Plaintiff** | Meitav Provident and Pension Funds Ltd. |
| **Plaintiffs** | Meitav and Samantha Smith |
| **Meitav** | Meitav Provident and Pension Funds Ltd. |
| **MFA** | Multi-factor authentication |
| **NRR** | Net revenue retention |
| **NYSE** | New York Stock Exchange |
| **SaaS** | software-as-a-service |
| **SEC** | U.S. Securities and Exchange Commission |
| **SQL** | Structured Query Language |

Lead Plaintiff Meitav Provident and Pension Funds Ltd. ("Meitav" or "Lead Plaintiff") and additional Plaintiff Samantha Smith ("Smith," and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, stock charts, and announcements made by Defendants, United States Securities and Exchange Commission filings, wire and press releases regarding Snowflake Inc. ("Snowflake" or the "Company"), analysts' reports and advisories about the Company, interviews by investigators of former employees, and information readily obtainable on the Internet. Plaintiffs believe that further evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Snowflake stock between June 26, 2023 and June 10, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Snowflake is a software company that provides cloud data storage that enables customers to consolidate data onto data-driven applications and share data for the purpose of running analytics and other processes.

3. The Company utilizes a consumption model, rather than the more traditional license model common in the software industry. Under this model, Snowflake sells its services and products in units called "credits," which must be used, or "consumed" by customers over a contractually defined period of time. Snowflake recognizes revenue as credits are consumed.

4. During the Class Period, Defendants repeatedly misled investors about two central aspects of the Company's business: customer consumption and storage trends, and cybersecurity.

5. *First*, during the Class Period, Defendants Slootman and Scarpelli misled investors to believe that Snowflake's customer consumption and storage growth was not suffering from three specific negative trends, when in fact they were. These three negative trends were the following.

6. (1) During the Class Period, Snowflake was implementing changes to its technology and system architecture that made its data manipulation more efficient for customers. With this new efficiency, customers consumed fewer Snowflake credits, so these efficiency gains threatened Snowflake's ability to generate revenue increases at historical rates.

7. (2) Customers began to adopt Iceberg Tables to organize their data. Iceberg Tables, developed by the nonprofit Apache Software Foundation, are open-source analytical table formats that can be used to organize massive datasets in customer cloud data lakes. The individual files in a data lake do not contain enough information needed by query engines and other applications to be used effectively. Iceberg Tables address this issue by providing metadata that enables capabilities and functionalities similar to those offered by SQL tables in a traditional relational database. Importantly, a customer may apply Iceberg Tables to organize their in-house data lakes, so customers that adopt Iceberg Tables may store their data in-house rather than with Snowflake. Customer adoption of Iceberg Tables during the Class Period caused Snowflake to lose momentum as to storage revenue and consumption revenue, as customers began to store their data in-house rather than with Snowflake and no longer paid Snowflake as much for the consumption related to their use of Snowflake's data storage facilities.

8. (3) To counter the negative impact of Iceberg, Snowflake began to offer discounts on its storage pricing to all of its customers with annual spend of $1.2 million or greater—*i.e.*, all of Snowflake's largest customers. Snowflake did not disclose these discounts, even though they negatively impacted revenue going forward.

9. During the Class Period, Defendants Slootman and Scarpelli repeatedly made statements indicating that these three negative trends were not a serious threat to Snowflake's revenue

growth from consumption and storage, when in fact they were. For example, Defendant Scarpelli stated on an August 23, 2023 investor conference call that "[w]e're not seeing customers reduce their consumption right now." This statement was at best half-true, as at the time, customer consumption growth rates were being negatively impacted by efficiency gains and Iceberg Table adoption. In an SEC filing made a few days later (and in later filings), Defendants Slootman and Scarpelli stated, "[c]onsumption for most customers accelerates from the beginning of their usage," when at the time, consumption growth rates for most customers were decelerating due to efficiency gains and Iceberg Table adoption. The same Defendants stated that "[n]ew software releases or hardware improvements . . . *may* make our platform more efficient" and "we *may* experience lower revenue," and so directly indicated that these improvements had not yet materially improved the platform efficiency and had not yet negatively impacted revenue as a result, when they had. Similarly, these Defendants stated that "our discounting practices, including as a result of changes to the competitive environment" "*could* hinder any improvement in our product gross margin," and so implied that these discounting practices had not yet negatively impacted their (storage) product gross margin, when in fact they had.

10. *Second*, during the Class Period, Defendants misled investors to believe that Snowflake's cybersecurity program effectively mitigated cybersecurity risks, and that its placing responsibility on customers to manage access credentials was an appropriate and acceptable means of addressing these risks. To the contrary, it increased customer-level data breach risk. Early in the Class Period, the Company posted a statement online about cybersecurity that claimed "[o]ur guiding principle is to minimize the customer's obligations under the model and assume a majority of the responsibilities." In fact, Snowflake placed full responsibility for securing access credentials (the most critical component of cybersecurity) on customers, who were not capable of securing those credentials effectively. Later, Defendants Slootman and Scarpelli stated in the Company's annual report that: "We have implemented and maintain a cybersecurity program designed to . . . manage material risks from cybersecurity threats to . . . our customers' data," and in the same breath stated, "[a]s part of this shared security model, customers have sole responsibility for creating and

securing their access credentials for our platform." In this statement, Defendants misleadingly implied that, as part of their cybersecurity program designed to manage cybersecurity threats, Snowflake had assessed customers' ability to secure access credentials, and determined that they were adequate.

11. They were not adequate. The industry standard for securing access credentials is a security process called multi-factor authentication ("MFA"), which requires that multiple methods of authenticating access credentials be used to grant access. Not only did Snowflake not require MFA—the Company turned off MFA for access *by default* and made the process of enabling MFA difficult for customers. As a result, as Defendants appreciated, many customers (including some large, well-known customers) had not enabled MFA, which left vast amounts of Snowflake customer data unsecure, and open to a devastating data breach, which occurred toward the end of the Class Period.

12. Defendants knew well that their misstatements were misleading. Defendant Scarpelli *admitted* that he tracked the Company's consumption figures on a daily basis, and so knew well that efficiency gains and Iceberg Table adoption were negatively impacting consumption trends. Defendant Scarpelli likewise *admitted*, alongside Defendant Slootman, that Snowflake had begun to offer, and customers had begun to take advantage of, discounted storage pricing in Q3 FY 2024, specifically in response to Iceberg Table adoption. Defendants Slootman and Scarpelli were well aware that their statements concerning consumption and storage trends and cybersecurity were misleading. Moreover, Defendant Slootman and the Board of Directors received regular reports regarding cybersecurity risks. Indeed, the board of directors, had "oversight responsibility with respect to the management of cybersecurity risks."

13. Moreover, Defendant Slootman had an extraordinary personal motive to inflate the price of Snowflake shares artificially. During the Class Period, Slootman created a Rule 10b5-1 sales plan that was designed to sell a tsunami of shares once Snowflake reached very high prices—and before the share price collapsed when the truth regarding the Company's serious challenges was revealed. Thus, after tepid personal stock sales in early 2023, Slootman sold approximately ***$223***

***million*** worth of Snowflake stock in only ***46 days***, right before the Company disclosed devastating news about the specific business challenges detailed above.

14. Indeed, Slootman schemed to quash market rumors in 2023 that he was on his way out as CEO, so that he could gaslight the market in this very way. After having vehemently denied a Business Insider report on June 2023 that he was considering retirement, on February 28, 2024 CEO Slootman made a "surprise" announcement that he was retiring, effective the previous day.

15. On February 28, 2024, when Defendants revealed the falsity of their prior misstatements downplaying the impact of efficiency gains, Iceberg Tables and discounted storage pricing on Snowflake's business, Snowflake's stock price plummeted by almost ***one fifth***. CFO Scarpelli stated on an earnings call that day: "We are forecasting increased revenue headwinds associated with product efficiency gains, tiered storage pricing and the expectation that some of our customers will leverage Iceberg Tables for their storage." He added: "we do expect a number of our large customers are going to adopt Iceberg formats and move their data out of Snowflake where we lose that storage revenue and also the compute revenue associated with moving that data into Snowflake." As to discounted pricing, Scarpelli noted: "we rolled out in Q4 tiered storage pricing. So, the amount of revenue associated with storage is coming down." This "forecast" reflected negative trends long known, but concealed so that Slootman could dump his shares, and surreptitiously plan his exit. Indeed, Slootman was dumping his shares just as the Company was introducing tiered storage pricing.

16. In reaction, Snowflake's stock price dropped ***18.14%***, or $41.72 from a close of $230.00 per share on February 28, 2024 to $188.28 per share on February 29, 2024. Trading volume was 42.3 million shares, a sharp increase from ordinary daily numbers.

17. Similarly, when the risks that the Company had concealed about its cybersecurity "shared" model materialized, the value of the Company's stock declined precipitously. The risk materialized in the form of a massive cyberattack. On May 22, 2024, cybersecurity watchdog Mandiant notified Snowflake and law enforcement of an ongoing hacker campaign focusing on Snowflake customers. On May 30, 2024 Snowflake reported: "We became aware of potentially

unauthorized access to certain customer accounts on May 23, 2024." Snowflake's stock price dropped 3.38% on unusually heavy trading volume. Then on June 10, 2024, Mandiant reported that as many as 165 companies had been affected, including household names such as Ticketmaster, AT&T, Santander Group, Advance Auto Parts, Lending Tree and Neiman Marcus. Snowflake's stock price dropped 3.39%, again on unusually heavy trading volume.

18. As a result of Defendants' false and misleading statements, Plaintiffs and other Class members purchased Snowflake's common stock at artificially inflated prices and suffered significant losses when the truth was revealed and concealed risks materialized. Defendants' conduct violated the federal securities laws, and Plaintiffs seek to recover damages on behalf of the Class.

## II. JURISDICTION AND VENUE

19. The claims asserted arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

20. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). At all relevant times, Snowflake conducted substantial business in this District and many of the acts and practices complained of herein occurred in substantial part in this District. Snowflake maintains its corporate offices in Menlo Park, California.

22. In connection with the material misrepresentations of facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities exchanges.

## III. THE PARTIES

### A. Plaintiffs

23. Plaintiff Meitav Provident and Pension Funds Ltd. purchased Snowflake common stock as detailed in the previously filed Certification and was damaged thereby.

24. Plaintiff Samantha Smith ("Plaintiff") purchased Snowflake common stock on March 28, 2024 as detailed in the previously filed Certification and was damaged thereby.

### B. Defendants

25. Defendant Snowflake is a cloud storage, SaaS firm incorporated in Delaware and maintaining principal executive offices at 135 Constitution Drive, Menlo Park, CA 94025. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "SNOW."

26. Defendant Slootman served as the Company's Chief Executive Officer from April 26, 2019 until February 27, 2024. Slootman has also served as the Chairman of Snowflake's Board of Directors from December 2019 until the present. Prior to his involvement with Snowflake, Slootman was CEO and President of ServiceNow, a company specializing in helping businesses reduce their reliance on email and spreadsheets by "automating" many daily tasks.

27. Defendant Scarpelli served as the Company's Chief Financial Officer ("CFO") from April 29, 2019 until February 25, 2025, when he announced his retirement.

28. Defendants Slootman and Scarpelli are referred to herein as the "Individual Defendants."

29. Snowflake and the Individual Defendants are referred to collectively as "Defendants."

## IV. BACKGROUND

### A. Company Background

30. Snowflake is a software-as-a-service ("SaaS") provider, specializing in cloud data storage. A customer that generates large amounts of data can use its own computing and storage facilities or can upload their data to a large data bank manager like Snowflake. Many large and

small companies find it difficult, expensive, and cumbersome to create their own data storage facilities, as this is not their core business and can require sophisticated expertise and considerable expense. Moreover, due to an active hacker "community," customers of such companies seek high levels of security to prevent their data from being compromised. For these reasons, Snowflake has been able to sign up thousands of data storage customers.

31. Snowflake's founders included numerous experienced software executives, chief among them defendant Frank Slootman. Slootman was Snowflake's Chairman and CEO from 2019 to early 2024. Slootman worked closely with Defendant Michael P. Scarpelli, considered a Snowflake co-founder, who assumed the role of CFO in 2019. Under the leadership of Slootman and Scarpelli, Snowflake grew rapidly and completed an IPO in September 2020. At that time, it had more than 3,000 customers.

32. Snowflake's business model uses "consumption-based" pricing. Snowflake has described this model as follows: "The consumption model of pricing, also known as usage-based pricing or consumption-based pricing, operates on a pay-as-you-go approach. Unlike subscription-based pricing, which charges customers a set rate for a certain number of licenses or seats, usage-based pricing charges customers only for the resources they actually consume." Customers pay consumption charges for the ingestion of their data into Snowflake's data storage, and for queries and analyses performed on that data.

33. One of Snowflake's most important performance metrics is its "net revenue retention rate" or "NRR." Snowflake uses this metric to measure its retention and growth of customer workloads year over year. In simplified terms, NRR is product revenue from current customers in one year divided by the product revenue from those same customers in the prior year. Snowflake has described NRR and its significance in its public filings:

> We believe the growth in use of our platform by our existing customers is an important measure of the health of our business and our future growth prospects. We monitor our dollar-based net revenue retention rate to measure this growth. To calculate this metric, we first specify a measurement period consisting of the trailing two years from our current period end. Next, we define as our measurement cohort the population of customers under capacity contracts that used our platform at any point in the first month of the first year of the measurement period. [. . .]

> We then calculate our net revenue retention rate as the quotient obtained by dividing our product revenue from this cohort in the second year of the measurement period by our product revenue from this cohort in the first year of the measurement period. [. . .]

34. Investors recognized that NRR was a critical metric for the Company. Analyst Summit Research observed in a November 22, 2022 report that: "The most reliable performance metric for consumption-based revenue models for now is net revenue retention ("NRR"), which compares the growth of revenues generated by the same cohort of customers in the current year and the prior year to determine if the service is consistently being demanded, or if it is generally "shelfware" (*i.e.*, installed/subscribed by not consumed)."[1]

35. As shown in the below table, Snowflake's NRR was in decline throughout the Class Period.

| Fiscal Quarter | Net Revenue Retention Rate (NRR) |
|---|---|
| Q2 FY24 | 142% |
| Q2 FY24 | 135% |
| Q2 FY24 | 131% |
| Q1 FY 25 | 128% |

36. As explained below, this decline in NRR was due to multiple challenges facing Snowflake about which Defendants misled investors.

**B. By the Start of the Class Period, Trouble Was Emerging at Snowflake**

37. Prior to the Class Period, investors began to become concerned that Snowflake's once rapid growth was decelerating. In early 2023, a number of core business issues began to emerge that could set the stage for a major declines in sales, growth and, ultimately, the stock price. Company executives resisted acknowledging these internal issues for as long as they could. Instead, they favored blaming their own customers or the macro-economic environment.

38. For example, on the first quarter fiscal 2024 earnings call held on May 24, 2023, a great deal of discussion was held regarding consumption trends. CFO Scarpelli did not attribute consumption issues to any internal issues, but rather to difficulties customers were facing in their

[1] *See* Summit Research, Seeking Alpha, "Do You Really Understand Snowflake's Revenue Model?", available at: https://seekingalpha.com/article/4559880-do-you-really-understand-snowflake-revenue-model

own businesses. He stated, "A few of our largest customers have scrutinized Snowflake costs, as they face headwinds in their own businesses." CEO Slootman echoed this sentiment: "While enthusiasm for Snowflake is high, enterprises are preoccupied with cost in response to their own uncertainties."

39. Snowflake was facing challenges, but they could not be laid at the doorstep of the customers or their particular business issues. Rather, Snowflake was being adversely affected by increasing competition, including from open-source technologies like Iceberg Tables, described below. Snowflake, too, was the source of some of the downward consumption trends they were seeing. It was improving the efficiency of its technology to remain competitive. Aggravating these issues were growing customer demands for discounts on storage and other services.

40. By the second half of calendar year 2023, these headwinds were becoming increasingly significant. Instead of frankly disclosing them at this time so that investors could buy or sell based on actual information, the insiders denied the reality of Snowflake's growing internal business challenges.

## V. DEFENDANTS MISLED INVESTORS TO BELIEVE THAT SNOWFLAKE'S BUSINESS WAS NOT BEING NEGATIVELY IMPACTED BY EFFICIENCY GAINS, ICEBERG TABLES MIGRATIONS AND DISCOUNTED STORAGE PRICING, WHEN IN FACT IT WAS

41. Before and During the Class Period, Defendants Slootman and Scarpelli misled investors concerning three serious adverse customer consumption and storage trends. *First*, Snowflake introduced several technological improvements to its system that allowed customers to process their workloads more efficiently and so consume fewer credits, which negatively impacted Snowflake's revenue growth rates. *Second*, customers began to adopt Iceberg Tables and to store their data in-house. That trend negatively impacted Snowflake's consumption revenue growth rate associated with ingesting customer data into Snowflake's data facilities. *Third*, in response to customer adoption of Iceberg Tables, Snowflake began to offer discounts on storage pricing to almost half of its customers, which also negatively impacted revenue growth rates. These trends

reduced NRR during the Class Period and ultimately required the Company to slash its guidance for fiscal year 2025.

### A. Technological Efficiencies, Adoption of Iceberg Tables and Discounted Storage Pricing Negatively Impacted Consumption and Storage Trends

#### 1. Efficiency Gains Negatively Impacted Customer NRR and Consumption Trends

42. During 2023, Snowflake rolled out a number of improvements to its system that dramatically increased the efficiency of its system architecture that correspondingly reduced Snowflake's NRR rate by reducing the consumption for which Snowflake would otherwise have been able to bill customers.

43. In June 2023, Snowflake greatly improved compile times for simple queries and Data Manipulation Language (DML) statements. Before running a query, Snowflake "compiles" it by parsing the Structured Query Language (SQL), checking security, reading metadata, and mapping out an optimization strategy. This happens in the Cloud Services layer of Snowflake's architecture. Snowflake removed a bottleneck that reduced compilation time for simple point queries or single-row DML operations from several hundred milliseconds to just a few milliseconds. Previously, compilation time took up 80% to 90% of the total query duration, so this reduction in compile time drastically reduced total query time.

44. Between September and November of 2023, Snowflake rolled out architectural updates to its metadata infrastructure, with performance improvements to some of its metadata Application Programming Interfaces (APIs) (including show tables, show schemas and show databases). These updates optimized how the system handled Data Definition Language (DDL) metadata API calls.

45. These architectural updates to Snowflake's metadata infrastructure in September and November of 2023 were monumental—they reduced average query times when returning large result sets by *nearly 30%* by November 2023. These reductions correspondingly reduced the consumption for which Snowflake could bill the customers and so negatively impacted revenues.

### 2. Adoption of Iceberg Tables Negatively Impacted Customer Storage and Consumption Trends

46. Iceberg Tables are open-source analytical table formats from the nonprofit technology company Apache designed for massive datasets in cloud data lakes.

47. As background, a data lake is a vast, centralized storage space that holds large amounts of data in its raw, natural format. Data lakes are ideal for storing massive amounts of structured, semi-structured and unstructured data in native file formats. They provide organizations with a comprehensive way to explore, refine and analyze petabytes of information arriving from multiple data sources.

48. However, the individual files in a data lake do not contain enough information needed by query engines and other applications to be used effectively for various management tasks. As a result, it is difficult and time-consuming to perform these tasks. Table formats address these issues by providing metadata that enables capabilities and functionalities similar to those offered by SQL tables in a traditional relational database. They explicitly define a table, its schema, its history and each file that composes a table. In addition, table formats such as Iceberg enable ACID compliance, allowing multiple applications to safely work on the same data simultaneously.

49. Accordingly, a table format is a metadata layer that defines a table on top of raw lake files—capturing the table schema, history, and exactly which files belong to the table—so it can behave more like an SQL table. Without this layer, data lakes are simply a collection of files—making it harder/slower to support reliable performance, safe incremental changes, and consistent reads when many jobs interact with the same dataset.

50. Apache Iceberg is an open-source table format (from Netflix, now Apache) designed for large analytics tables in data lakes, with strong metadata management.

51. Importantly, Snowflake customers may use Iceberg Tables with their existing data, stored at the customers' own facilities, and so may avoid paying Snowflake to store their data.

52. Beginning as early as August 2022 and during the Class Period, many customers began to use Iceberg Tables with their data and stopped using Snowflake for data storage.

Accordingly, widespread adoption of Iceberg Tables by Snowflake customers negatively impacted Snowflake's storage revenue trend during the Class Period and going forward.

53. Such widespread adoption of Iceberg Tables also threatened Snowflake's revenue from consumption. A large portion of Snowflake's revenues are attributable to the consumption required to "ingest" customers' data into Snowflake's system. When customers adopt Iceberg Tables and cease to store data with Snowflake, Snowflake loses the significant revenue it would have received from the consumption required to ingest that data.

54. A former employee ("FE1") has confirmed that approximately 40% of Snowflake's revenue comes from the consumption costs associated with ingesting customer data. FE1 worked at Snowflake from March 2014 to February 2022 and from February 2023 to January 2025. FE1 served as Global Account Manager, Financial Services from February 2023 to January 2025. In this role, FE1 managed one of Snowflake's top ten customers. FE1 stated that approximately 40% of Snowflake's revenue comes from the consumption cost of ingesting the data into a usable format, and noted that this consumption is separate from the consumption associated with analyzing or querying the data. According to FE1, this meant that "transitioning to Iceberg would have a material impact on the overall consumption." "Snowflake was cannibalizing itself by supporting Iceberg," FE1 said.

55. According to FE1, customers were already asking about transitioning to Iceberg Tables by the time FE1 resumed working at Snowflake in February 2023.

56. A second former employee has confirmed that customers had begun adopting Iceberg Tables in 2023. FE2 worked at Snowflake from January 2018 to January 2022 as a Technical Account Manager, and from January 2023 to January 2025 as a Sales Engineering Manager for Healthcare. In the latter role, FE2 "was the technical counterpart for sales reps," and FE2 co-managed a book of business with the district manager. FE2 explained that this role gave him visibility into customer practices. According to FE2, customers had begun adopting Iceberg Tables in 2023, and the perception within the Company in 2023 was that Snowflake was "going to take a consumption hit" from Iceberg adoptions going forward.

57. Indeed, according to another former employee ("FE3"), one of Snowflake's largest customers, Apple Inc., was already pushing Snowflake to support Iceberg Tables between 2021 and 2023. FE3 worked at Snowflake from November 2019 to April 2024 as a Senior Sales Engineer. In this role, FE3 supported sales with technical guidance, and Apple was FE3's main customer.

58. A fourth former employee ("FE4") has confirmed that customers wanted Snowflake to support Iceberg Tables as early as 2022, and that customer adoption of Iceberg Tables threatened Snowflake's storage revenue. FE4 worked at Snowflake from February 2020 to May 2026 as a sales director for the Media, Entertainment and Advertising team. As FE4 explained, a customer that used Iceberg Tables to organize their own data lakes did not need to store data with Snowflake, and so Snowflake lost storage revenue from Iceberg Table users: "If it's sitting in external tables, or Iceberg Tables, then snowflake is not getting the storage revenue that they would." According to FE4, historically revenue from storage alone (separate from ingestion consumption) amounted to a material 10% to 11% of the Company's revenue.

59. According to a fifth former employee ("FE5"), customers started asking Snowflake for support for Iceberg Tables at the beginning of 2022, and Snowflake began offering Iceberg Tables privately to individual customers in the third quarter of calendar year 2022. FE5 worked as a Field CTO-Data Platform Architect at Snowflake from December 2018 to April 2023. In this role, FE5 supported specialty and sales engineers who would call on them to help customers with whatever issues they were having.

60. During the Class Period, Defendants downplayed the significance of Iceberg Table adoption. For example, the Company held an earnings conference call on August 23, 2023. On that call, CEO Slootman barely mentioned Iceberg, and falsely portrayed it as an unmitigated positive for Snowflake:

> With our support of Iceberg Tables, we are expanding our data lake scope. Many customers already use Snowflake as a data lake. Large financial services customer consolidates data in Snowflake to eliminate useless extract and transfers of data. This means new use cases are deployed 80% faster. Iceberg Tables will bring

> additional scope in open file formats to Snowflake. We expect to unlock more data lake opportunities with these capabilities.

61. CFO Scarpelli added on that same call:

> [C]onsumption is good. It was really good today as an example. But it's only one data point. We want to see more days of that before we think the—we're into a real recovery. I think stabilization is the right term. We're not seeing customers reduce their consumption right now.

#### 3. Tiered Storage Pricing Negatively Impacted Storage Revenue

62. After Snowflake began to support Iceberg Tables beginning in late 2022, in order to convince customers not to move their data storage in-house and cease storing their data with snowflake, Snowflake began during Q3 in 2023 to offer discounts to larger customers on their data storage costs. Historically, Snowflake had offered storage discounts to a few of its largest customers. However, beginning in the third quarter of fiscal year 2024 (beginning August 1, 2023), the Company began to offer discounts on data storage to all customers with a minimum spend of $1.2 million. This included all of Snowflake's largest customers.

63. Snowflake's data storage discounts negatively impacted its revenue from storage, which historically had amounted to a material 10% to 11% of its revenues.

### B. Defendants Misled Investors To Believe That Consumption Was Not Suffering from More Efficient Processing, Iceberg Tables Migrations and Discounted Storage Pricing

64. As explained above, in the second half of 2023, Snowflake was suffering from an ongoing negative impact on customer consumption and storage from efficiency improvements in Snowflake's system, the widespread adoption of Iceberg Tables, and Snowflake's introduction of discounts in its storage pricing to all of its largest customers. These trends were causing Snowflake's NRR growth to decline substantially.

65. Nevertheless, Defendants repeatedly made statements that misled investors to believe that customer consumption was not being negatively impacted and that the Company was not offering discounts that were hindering improvements in the Company's margins.

66. On August 23, 2023, Snowflake held an investor conference call to discuss its earnings in the second quarter of fiscal year 2024. On that call, Defendant Scarpelli misled investors about customer consumption trends:

> [. . .] I definitely think the fact that we kind of saw customers more reengaging with us in July on contracts and that continues into this quarter, I think it is easing a little bit at the top level in terms of approvals for customers and they're willing to commit. But it takes time to convert that to consumption. With that said, consumption is good.
>
> It was really good today, as an example. But that's only one data point. It's—we want to see more days of that before we think the—we're into a real recovery. I think stabilization is the right term.
>
> **We're not seeing customers reduce their consumption right now.**
>
> (Emphasis added.)

67. In fact, Scarpelli's statement was at best a half-truth. As explained above, at the time, customer consumption was decelerating from efficiency improvements and adoption of Iceberg Tables, and in those ways, customers were indeed reducing their consumption.

68. Defendants Slootman and Scarpelli reiterated this misrepresentation a few days later, on August 31, 2023, when Defendants filed their quarterly report on Form 10-Q for the second quarter of fiscal year 2024. In that filing, Defendants stated:

> Our customers typically enter into capacity arrangements with a term of one to four years, or consume our platform under on-demand arrangements in which we charge for use of our platform monthly in arrears. **Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts.**
>
> (Emphasis added.)

69. In fact, at the time of this misstatement, consumption for a majority of customers was not accelerating—it was decelerating due to efficiency improvements and adoption of Iceberg Tables.

70. In the same August 31, 2023 10-Q, Defendants Slootman and Scarpelli directly implied that, at the time of the statement, improvements in software and hardware were not already making the Snowflake platform more efficient and were not already negatively impacting revenue:

> **New software releases or hardware improvements**, like better storage compression and cloud infrastructure processor improvements, ***may* make our platform more efficient**, enabling customers to consume fewer compute, storage, and data transfer resources to accomplish the same workloads. To the extent these improvements do not result in an offsetting increase in new workloads, **we *may* experience lower revenue**.

(Emphasis added.)

71. In stating that such improvements "may" make our platform more efficient, Defendants misleadingly implied that that event was merely an unrealized possibility, when in fact, that possibility had already materialized: by the time of this statement, new software and hardware improvements already had made the Snowflake platform materially more efficient and enabled customers to consume fewer resources.

72. Similarly, in stating that Snowflake "may" experience lower revenue as a result of software and hardware improvements, Snowflake told at best a half-truth—these improvements already had negatively impacted consumption and so had already negatively impacted the Company's revenue growth rates.

73. In the same August 31, 2023 10-Q, Defendants Slootman and Scarpelli stated:

> While **we expect our product gross margin to remain relatively flat for the fiscal year ending January 31, 2024**, **a number of factors *could* hinder any improvement in our product gross margin**, **including** (i) fluctuations in the mix and timing of customers' consumption, which is inherently variable at our customers' discretion, (ii) whether or not a customer contracts with us through our marketplace listings, (iii) **our discounting practices, including as a result of changes to the competitive environment**, and (iv) the extent of our investments in our operations, including performance improvements that may make our platform or the underlying cloud infrastructure more efficient.

(Emphasis added.)

74. Here, in stating that their "discounting practices" "could hinder any improvement in our product gross margin," Defendants again misleadingly stated as a mere possibility an event that had already come to pass—Snowflake already had begun discounting its storage pricing in response to the competitive environment created by Iceberg Tables, so its discounting practices already had begun to hinder any improvement in Snowflake's product gross margins (Snowflake's storage gross margins, in particular).

75. On December 1, 2023, Defendants Slootman and Scarpelli filed Snowflake's quarterly report on Form 10-Q for the third quarter of fiscal year 2024. In that filing, Defendants repeated substantially the same misleading statements in their August 31, 2023 10-Q filing. These statements were misleading for the same reasons. Indeed, they were all the more misleading when stated in December 2023, as by that time, Snowflake's customers had reduced their consumption rates significantly due to efficiency improvements and adoption of Iceberg Tables, and many had adopted discounted storage pricing.

**C. Defendant Slootman Was Dumping His Shares and Secretly Planning Retirement**

76. At the same time Defendant Slootman was falsely assuring investors that the Company's consumption and storage trends were not suffering negative impacts, he established a Rule 10b5-1 sales plan that would supercharge his personal stock sales in the weeks prior to his surprise retirement and negative revelations concerning Snowflake's consumption and storage trends. Defendant Slootman established this plan on September 25, 2023, shortly after the start of the Class Period. As detailed below, under his new plan, Slootman sold approximately $223 million worth of Snowflake stock in only 46 days, including a $50 million sale made only 19 days before his retirement announcement.

77. Defendant Slootman also concealed his retirement plans. Slootman's engagement in the business was highly material to investors. In mid-2023, a rumor surfaced that Slootman would soon retire. On June 26, 2023, *Business Insider* published an article in which Slootman vehemently denied this rumor:

> Snowflake CEO Frank Slootman tells Insider that ongoing rumors that he could soon step down are completely untrue. Insider heard rumors of Slootman's departure from multiple industry sources, and reached out to ask Slootman if he was leaving soon. "You are wrong on all counts. You are regurgitating competitive FUD," Slootman told us in his famously direct, no-nonsense style. FUD, or fear-uncertainty-doubt, is a favorite old-school tech acronym.

78. In actuality, Slootman was contemplating retirement, and the Board was about this time or shortly thereafter engaged in a CEO search, with heavy focus on Sridhar Ramaswamy, Snowflake's Senior Vice President of AI and a former Google executive.

79. Defendant Slootman announced his retirement on February 28, 2024—the same day on which Snowflake announced the disastrous consumption and storage trends about which Defendants had repeatedly misled investors.

**D. When the Truth About Threats from New Efficiencies, Competitive Pressure from Iceberg and Discounted Storage Pricing Was Revealed, Investors Suffered Severe Losses**

80. On February 28, 2024, after the market closed, Snowflake issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the fourth fiscal quarter and full year 2024, provided guidance, and conducted a conference call with investors and analysts. Defendants shocked investors by disclosing that consumption trends and anticipated revenue headwinds associated with product efficiency gains, Iceberg Tables, and discounted storage pricing had impacted their guidance.

81. On the February 28, 2024 conference call with investors and analysts, Defendant Scarpelli admitted that consumption trends had deteriorated since the start of fiscal year 2024 (*i.e.*, February 2023) and had not recovered since, and that the Company had suffered, and would increasingly continue to suffer, from headwinds from product efficiency gains, discounted storage, and Iceberg Tables:

> **Consumption trends have improved since the ending of last year, but have not returned to pre-FY '24 patterns.** We have evolved our forecasting process to be more receptive to recent trends. For that reason, **our guidance assumes similar customer behavior to fiscal 2024**. **We are forecasting increased revenue headwinds associated with product efficiency gains, tiered storage pricing and the expectation that some of our customers will leverage Iceberg Tables for their storage.**

(Emphasis added.)

82. On the same call, Scarpelli explained that "[t]hese changes in our assumptions impact our long-term guidance." Snowflake withdrew its longstanding $10 billion 2029 product

revenue target and lowered FY 2025 guidance to approximately $3.25 billion, or 22% year-over-year growth, drastically below the market's expectation of 30%.

83. On that same day, Defendant Scarpelli admitted that Snowflake's product efficiency gains were having a material 6.2-6.3% negative impact on annual revenue growth, and that Snowflake had already begun to see the impact of these efficiency gains, as well as the impact of discounted (tiered) storage pricing, as early as Q4 2024 (late calendar year 2023):

> **It's about a 6.2%, 6.3% impact this year [from product efficiency gains].** And—but coupled with that, too, in the revenue, we rolled out in Q4 tiered storage pricing. So the amount of revenue associated with storage is coming down. But on top of that, we do expect a number of our large customers are going to adopt Iceberg formats and move their data out of Snowflake where we lose that storage revenue and also the compute revenue associated with moving that data into Snowflake. We do expect, though, there'll be more workloads that will move to us, but until we see that incremental revenue on workloads, we're not going to forecast that.
>
> (Emphasis added.)

84. Scarpelli further noted that many "big customers" were transitioning to Iceberg Tables.

> **A lot of big customers want to have open file formats** to give them the options. And by the way, this is not necessarily customers moving all of their storage out of Snowflake, but **a lot of the growth in their storage will be put into Iceberg Tables** is what we think is going to happen. So you're just not going to see the growth associated with the storage and many of those customers. As a reminder, about 10% to 11% of our overall revenue is associated with storage.
>
> (Emphasis added.)

85. On February 28, 2024, after the market closed, Snowflake also issued a press release and filed a report with the SEC on Form 8-K that disclosed that effective February 27, 2024, Frank Slootman retired as Chief Executive Officer of Snowflake Inc.

86. On March 5, 2024, Scarpelli admitted at a presentation: "I do think some of our larger customers, because they've told us they want to, will move to open-file formats in Iceberg. That will take storage out of Snowflake." As Scarpelli had admitted a week earlier on February 28, 2024, Snowflake had "rolled out in Q4 tiered storage pricing," which the Company did to

counteract the impact of Iceberg Tables, so Scarpelli admitted that customer migration to Iceberg was well in place during the Class Period.

87. Shockingly, on the earnings call, CEO Slootman announced his surprise retirement: "This marks my retirement from an operating role. I will remain on duty as Chairman of the Board, and look forward to working with Sridhar and the team going forward."

88. Investors were dismayed by Snowflake's revelations that, contrary to Defendants' assurances, consumption and storage trends were seriously undermining its business. Snowflake's stock price dropped $41.72 (18.14%,) from a close of $230.00 per share on February 28, 2024 to $188.28 per share on February 29, 2024. Trading volume was 42.3 million shares, a sharp increase from ordinary daily numbers.

## VI. DEFENDANTS MISLED INVESTORS TO BELIEVE THAT SNOWFLAKE'S CYBERSECURITY PROGRAM EFFECTIVELY MITIGATED CYBERSECURITY RISKS, AND THAT ITS PLACING RESPONSIBILITY ON CUSTOMERS TO MANAGE ACCESS CREDENTIALS DID NOT MAKE THE PROGRAM VULNERABLE

### A. Snowflake's Cybersecurity Program Assigned Responsibility for Securing Access Credentials to Customers, Which Created a Massive Security Risk

89. Data breaches have affected software companies for many years. Companies like Snowflake can deter the vast majority of data breaches by adopting strong security measures.

90. The electronic storage industry was shaken by a series of data breaches in 2023, in record-setting numbers. The 3,205 data breaches in 2023 represented a 78% increase over the number in 2022. Defendants knew that a major data breach affecting Snowflake would be harmful to the Company and its stockholders.

91. Defendants also knew that a major deterrent to a breach was "multi-factor authentication" or "MFA," the gold standard of user protection. MFA is a security process that requires two or more different ways to prove your identity before you can log into an account or app, such as entering a password and then separately entering a code received via text message. However, Snowflake's system architecture set up roadblocks: MFA was turned off by default, and system administrators could not independently impose the safety measure. Indeed, prominent customers had

proved unable to manage security for access credentials and were unable to navigate Snowflake's customer-unfriendly tools.

92. Snowflakes' practice of assigning responsibility to customers for securing access credentials did not align with industry best practices. Best practices in Snowflake's industry are set forth by CISA. On its website, CISA states: "CISA provides information on cybersecurity best practices to help individuals and organizations implement preventative measures and manage cyber risks." In its October 2023 white papers, CISA criticized practices essentially identical to Snowflake's. The white paper, which contained an overview section captioned "Vulnerable By Design," declared that resting cybersecurity on the shoulders of the customers was "untenable." Security risk was such a difficult and specialized issue, CISA noted, that even many IT professionals could not adequately comprehend what was required. Thus, "Applications should be made with clear indicators about the potential risks that may result from [product] settings and should make those indicators known." Many customers were, CISA found, "generally unable to facilitate" what was needed to maintain security—*i.e.,* to "to research, fund, purchase, staff, deploy, and monitor additional security products to reduce the chance of compromise." *Id.*

**B. Defendants Misled Investors to Believe That Snowflake's Cybersecurity Program Managed and Mitigated Cybersecurity Risks, and That Its Placing Responsibility on Customers to Manage Access Credentials Did Not Make the Program Vulnerable**

93. Defendants misled investors about Snowflake's cybersecurity. Early in the Class Period, the Company misled investors to believe that Snowflake assumed the majority of the responsibility for cybersecurity, when in fact it placed sole responsibility for securing access credentials on customers. Even worse, Defendants misled investors in 2024 by creating the misimpression that its cybersecurity program adequately mitigated cybersecurity risks, and so was not vulnerable as a result of assigning responsibility for securing access credentials to customers.

94. On September 12, 2023, the Company posted a document on the internet titled, "Understanding Snowflake's Shared Responsibility Model," which stated:

> With the Shared Responsibility Model, our users can now have a more comprehensive view of their security obligations as well as the measures we, at

> Snowflake, have implemented to protect user data. This model fosters transparency and empowers our users to actively participate in securing their Snowflake deployments. **Our guiding principle is to minimize the customer's obligations under the model and assume a majority of the responsibilities** through automation and feature availability within Snowflake's product offering. This is clear from the size of the customer side of our model compared to other vendors in the market.

95. In fact, as noted above, Snowflake placed the majority of the responsibility for data security onto its customers. Snowflake assigned full responsibly to customers for securing access credentials, but securing access credentials is the greatest responsibility in a cybersecurity program—much like securing the key to a car is a critical responsibility to ensure that it is not stolen.

96. Defendants actionably misled investors about Snowflake's cybersecurity in the second half of the Class Period. On March 26, 2024, Snowflake filed its annual report for fiscal year 2024 on Form 10-K. In the report, Defendants Slootman and Scarpelli stated in part:

> **We have implemented and maintain a cybersecurity program designed to** identify, assess, and **manage material risks from cybersecurity threats to** (i) our information systems and data, which include critical computer networks, third-party hosted services, communications systems, hardware and software, and (ii) critical data, including our intellectual property, confidential information that is proprietary, strategic or competitive in nature, and **our customers' data**.
>
> [. . .]
>
> **Our security teams work with management to** prioritize our risk management processes and **mitigate cybersecurity threats, including those that may materially impact our business**. [. . .] We also employ a shared responsibility model where our customers are responsible for using and configuring our platform in a manner that meets applicable cybersecurity standards. As part of this shared security model, customers have sole responsibility for creating and securing their access credentials for our platform.

97. This statement was false and misleading because, in stating that the Company's cybersecurity program was designed to "manage material risks from cybersecurity threats to . . . customer's data," and that the program did "mitigate cybersecurity threats," the statement implied that the program was consistent with industry standards for protection, and so implied that the program was not vulnerable due to numerous customers failing to secure access credentials with MFA.

98. In fact, Snowflake's cybersecurity program did not effectively manage cybersecurity threats because Snowflake did not support its customers in securing access credentials—Snowflake did not make MFA available by default and limited the only MFA solution available to Snowflake customers to one option, the app "Duo" from Cisco. The company also placed restrictions on administrator enforcement of MFA. In these ways, Snowflake's cybersecurity program departed from industry norms and did not effectively mitigate cybersecurity threats.

**C. When the Heightened Risk of Cybersecurity Attacks on Client Data Materialized, Investors Suffered Losses**

99. In May 2024, Snowflake customers suffered a massive data breach affecting major Snowflake customers. The data breach affected at least 165 customers, including:

- AT&T—Over 50 billion call records and other customer data were exposed.
- Ticketmaster/Live Nation Entertainment—Unauthorized activity was detected in a third-party cloud database environment, and up to 530 million customers had their data compromised.
- Santander Group—Data from Santander Chile, Spain, Uruguay, and some former employees was accessed, affecting up to 30 million customer records, including account balances and transaction histories.
- Advance Auto Parts—Extensive customer data was compromised.
- LendingTree—Extensive financial and personal data were exposed.
- Neiman Marcus—Customer records were stolen involving 70 million transaction records containing gift card data and customer IP addresses.
- Bausch Health—Health and financial data were affected.

100. On May 22, 2024, cybersecurity watchdog Mandiant notified Snowflake and law enforcement of an ongoing hacker campaign focusing on Snowflake customers. As news about the breach became public bit-by-bit, Snowflake's shares dropped precipitously.

101. On May 30, 2024, Snowflake first publicly reported the breach: "We became aware of potentially unauthorized access to certain customer accounts on May 23, 2024." On this news,

Snowflake's stock price dropped $4.77 (3.38%) from a close of $140.95 per share on May 30, 2024 to $136.18 per share on May 31, 2024, on unusually heavy trading volume.

102. On June 10, 2024, Mandiant reported that as many as 165 companies had been affected, including household names such as Ticketmaster, AT&T, Santander Group, Advance Auto Parts, Lending Tree and Neiman Marcus. On this news, Snowflake's stock price dropped again, this time by $4.45 (3.39%) from a close of $131.21 per share on June 7, 2024 to $126.76 per share on June 10, 2024, on unusually heavy trading volume.

103. These price drops represented the materialization of a concealed risk—in assuring investors that it had a cybersecurity program that was designed to, and indeed did, mitigate cybersecurity risk, that assigned responsibility to customers for securing access credentials, Snowflake concealed that its customers were not equipped to secure access credentials and that its cybersecurity program was therefore unsecure. In short, Snowflake misled investors to believe that the risk that its customers' data would be compromised was very low, when in fact, the risk was very high. When that misrepresented risk materialized, investors suffered losses.

104. Industry insiders recognized that the breach resulted from Snowflake's failure to enable customers to secure access credentials. One tech security specialist, Dr. Frank Wang, noted in the wake of the breach that, "compared to other software, Snowflake does have a worse product security experience," which makes it "hard" to implement proper security. This difficulty resulted in a serious security risk, as Defendants knew customers had not adopted adequate security measures. Additionally, an article on Cybersecuritydive.com noted: "Snowflake's approach to MFA bears inherent limits for its IT administrators. An instance of Cisco Duo that is managed by Snowflake is the only MFA solution available to its customers, and the company doesn't allow administrators to enforce MFA for a specific role, according to the company's MFA support page." Ofer Maor, co-founder and CTO at Mitiga, stated that Snowflake was out of step with the industry: "While other vendors may also offer the ability to start without MFA, most SaaS vendors, once deployed as an enterprise solution, allow administrators to enforce MFA."

105. Indeed, in subsequent federal litigation addressing Snowflake's cybersecurity failures, the MDL Court found that allegations that Snowflake was culpable were credible enough to proceed: "It can be inferred that this [customer] failure to implement MFA arose from Snowflake's failure to enforce its standards." *See In re Snowflake, Inc.,* No. 2:24-MD-03126-BMM, 2025 LX 472160, at *23 (D. Mont. Oct. 29, 2025). In addition, Snowflake failed "to protect customer data from foreseeable risk of harm by providing additional security measures . . . ." *Id.* at *22.

## VII. MISLEADING STATEMENTS

106. This section details the misleading statements alleged and the reasons why they were misleading when made.

### A. June 26, 2023 Statement in *Business Insider* (Misstatement 1)

107. On June 26, 2023, *Business Insider* published an article that quoted Slootman denying that he had any plans to retire:

> Snowflake CEO Frank Slootman tells Insider that ongoing rumors that he could soon step down are completely untrue. Insider heard rumors of Slootman's departure from multiple industry sources, and reached out to ask Slootman if he was leaving soon. "You are wrong on all counts. You are regurgitating competitive FUD," Slootman told us in his famously direct, no-nonsense style. FUD, or fear-uncertainty-doubt, is a favorite old-school tech acronym.

108. This statement was false and misleading because at the time, Slootman was indeed contemplating retirement, and around this time, the Board was engaged in a CEO search.

### B. August 23, 2023 Conference Call (Misstatement 2)

109. On August 23, 2023, Snowflake held an investor conference call to discuss its earnings in the second quarter of fiscal year 2024. On that call, Defendant Scarpelli stated:

> [. . .] I definitely think the fact that we kind of saw customers more reengaging with us in July on contracts and that continues into this quarter, I think it is easing a little bit at the top level in terms of approvals for customers and they're willing to commit. But it takes time to convert that to consumption. With that said, consumption is good.
>
> It was really good today, as an example. But that's only one data point. It's—we want to see more days of that before we think the—we're into a real recovery. I think stabilization is the right term.

> **We're not seeing customers reduce their consumption right now.**

(Emphasis added.)

110. This statement was a false and misleading half-truth because, at the time, customer consumption trends were suffering from efficiency improvements and adoption of Iceberg Tables, and in those ways, customers were indeed reducing their consumption.

**C. August 31, 2023, Q2 2024 10-Q (Misstatement 3)**

111. On August 31, 2023, Defendants filed their quarterly report on Form 10-Q for the second quarter of fiscal year 2024. Defendants Slootman and Scarpelli signed the filing. In that filing, Defendants stated:

> Our customers typically enter into capacity arrangements with a term of one to four years, or consume our platform under on-demand arrangements in which we charge for use of our platform monthly in arrears. **Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts.**

(Emphasis added.)

112. This statement was false and misleading because, at the time of this misstatement, consumption growth for a majority of customers was not accelerating—it was decelerating due to efficiency improvements and adoption of Iceberg Tables.

**D. August 31, 2023, Q2 2024 10-Q (Misstatement 4)**

113. In the same August 31, 2023 10-Q, Defendants stated:

> **New software releases or hardware improvements**, like better storage compression and cloud infrastructure processor improvements, ***may* make our platform more efficient**, enabling customers to consume fewer compute, storage, and data transfer resources to accomplish the same workloads. To the extent these improvements do not result in an offsetting increase in new workloads, **we *may* experience lower revenue**.

(Emphasis added.)

114. These statements were false and misleading because: (1) new software and hardware improvements already had made the Snowflake platform more efficient and enabled

customers to consume fewer resources, and (2) these improvements already were having a negative impact on revenue trends.

**E. August 31, 2023, Q2 2024 10-Q (Misstatement 5)**

> While **we expect our product gross margin to remain relatively flat for the fiscal year ending January 31, 2024**, **a number of factors *could* hinder any improvement in our product gross margin**, **including** (i) fluctuations in the mix and timing of customers' consumption, which is inherently variable at our customers' discretion, (ii) whether or not a customer contracts with us through our marketplace listings, (iii) **our discounting practices, including as a result of changes to the competitive environment**, and (iv) the extent of our investments in our operations, including performance improvements that may make our platform or the underlying cloud infrastructure more efficient.
>
> (Emphasis added.)

115. This statement was false and misleading for two reasons. (1) Defendants did not expect product gross margins to remain relatively flat for the fiscal year ending January 31, 2024, as by that time Defendants knew that the Company would have to give discounts to compete with Iceberg Tables; (2) it was not a mere possibility that the Company's discounting practices (as a result of the introduction of Iceberg Tables) could hinder any improvement in product gross margins—that possibility had already transpired.

**F. December 1, 2023, Q3 2024 10-Q (Misstatement 6)**

116. On December 1, 2023, Defendants filed their quarterly report on Form 10-Q for the third quarter of fiscal year 2024. Defendants Slootman and Scarpelli signed the filing. In that filing, Defendants stated:

> Our customers typically enter into capacity arrangements with a term of one to four years, or consume our platform under on-demand arrangements in which we charge for use of our platform monthly in arrears. **Consumption for most customers accelerates from the beginning of their usage to the end of their contract terms and often exceeds their initial capacity commitment amounts**.
>
> (Emphasis added.)

117. This statement was false and misleading because, at the time of this misstatement, consumption growth for the average customer was not accelerating—it was decelerating due to efficiency improvements and adoption of Iceberg Tables.

**G. December 1, 2023, Q3 2024 10-Q (Misstatement 7)**

118. In the same December 1, 2023 10-Q, Defendants stated:

> **New software releases or hardware improvements**, like better storage compression and cloud infrastructure processor improvements, ***may*** **make our platform more efficient**, enabling customers to consume fewer compute, storage, and data transfer resources to accomplish the same workloads. To the extent these improvements do not result in an offsetting increase in new workloads, **we** ***may*** **experience lower revenue**.

(Emphasis added.)

119. These statements were false and misleading because: (1) new software and hardware improvements already had made the Snowflake platform more efficient and enabled customers to consume fewer resources, and (2) these improvements already were having a negative impact on revenue growth.

**H. December 1, 2023, Q3 2024 10-Q (Misstatement 8)**

> While **we expect our product gross margin to slightly improve for the fiscal year ending January 31, 2024**, **a number of factors** ***could*** **hinder any improvement in our product gross margin, including** (i) fluctuations in the mix and timing of customers' consumption, which is inherently variable at our customers' discretion, (ii) whether or not a customer contracts with us through our marketplace listings, (iii) **our discounting practices, including as a result of changes to the competitive environment**, and (iv) the extent of our investments in our operations, including performance improvements that may make our platform or the underlying cloud infrastructure more efficient.

(Emphasis added.)

120. This statement was false and misleading for two reasons. (1) Defendants did not expect storage product gross margins to slightly improve for the fiscal year ending January 31, 2024, as by that time Defendants knew that the Company would have to give discounts to compete with Iceberg Tables; (2) it was not a mere possibility that the Company's discounting practices (as

a result of the introduction of Iceberg Tables) could hinder any improvement in product gross margins—that possibility had already transpired.

**I. March 26, 2024, 2024 10-K (Misstatement 9)**

121. On March 26, 2024, Snowflake filed its annual report for fiscal year 2024 on Form 10-K. Defendant Scarpelli signed the filing. The report stated in part:

> **We have implemented and maintain a cybersecurity program designed to** identify, assess, and **manage material risks from cybersecurity threats to** (i) our information systems and data, which include critical computer networks, third-party hosted services, communications systems, hardware and software, and (ii) critical data, including our intellectual property, confidential information that is proprietary, strategic or competitive in nature, and **our customers' data**.
>
> [. . .]
>
> **Our security teams work with management to** prioritize our risk management processes and **mitigate cybersecurity threats, including those that may materially impact our business**. [. . .] We also employ a shared responsibility model where our customers are responsible for using and configuring our platform in a manner that meets applicable cybersecurity standards. As part of this shared security model, customers have sole responsibility for creating and securing their access credentials for our platform.
>
> (Emphasis added.)

122. This statement was false and misleading because, in stating that the Company's cybersecurity program was designed to "manage material risks from cybersecurity threats to . . . customer's data," and that the program did "mitigate cybersecurity threats," the statement implied that the program was consistent with industry standards for protection, and so implied that the program was not vulnerable due to numerous customers failing to secure access credentials with MFA.

## VIII. LOSS CAUSATION

123. This section explains how the allegations of this complaint satisfy the loss causation requirement of Section 10(b) of the Exchange Act.

124. Throughout the Class Period, Defendants' materially false and misleading statements and omissions caused the price of Snowflake's common stock to be artificially inflated.

Plaintiffs and other Class members purchased Snowflake's common stock at those artificially inflated prices.

125. As a result of public revelations of the truth about Snowflake's business and the materialization of concealed risks, the price of Snowflake's stock materially declined. This drop removed the inflation from Snowflake's stock price, causing real economic loss to investors who purchased the stock during the Class Period.

**A. February 28, 2024**

126. On February 28, 2024, after the market closed, Snowflake issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the fourth fiscal quarter and full year 2024, provided guidance, and conducted a conference call with investors and analysts. Defendants shocked investors by disclosing that consumption trends and anticipated revenue headwinds associated with product efficiency gains, Iceberg Tables and tiered storage pricing had impacted their guidance. CFO Scarpelli stated on an earnings call that day: "We are forecasting increased revenue headwinds associated with product efficiency gains, tiered storage pricing and the expectation that some of our customers will leverage Iceberg Tables for their storage." As to discounted pricing, Scarpelli noted: "we rolled out in Q4 tiered storage pricing. So, the amount of revenue associated with storage is coming down."

127. As a result, Defendants also withdrew their longstanding $10 billion 2029 product revenue target and lowered FY 2025 guidance to 22% year-over-year growth, drastically below the market's expectation of 30%.

128. Also on February 28, 2024, after the market closed, Snowflake also issued a press release and filed a report with the SEC on Form 8-K that disclosed that effective February 27, 2024, Frank Slootman retired as Chief Executive Officer of Snowflake Inc.

129. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the stock price dropped 18.14%, or $41.72 from a close of $230.00 per share on February 28, 2024 to $188.28 per share

on February 29, 2024. Trading volume was 42.3 million shares, a sharp increase from ordinary daily numbers.

**B. May 30, 2024**

130. On May 30, 2024 Snowflake first reported a serious data breach: "We became aware of potentially unauthorized access to certain customer accounts on May 23, 2024."

131. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the stock price dropped 3.38%, or $4.77 from a close of $140.95 per share on May 30, 2024 to $136.18 per share on May 31, 2024. Trading volume was 14.05 million shares, a sharp increase from ordinary daily numbers.

**C. June 10, 2024**

132. Finally, on June 10, 2024, Mandiant reported that as many as 165 companies had been affected by the data breach, including household names such as Ticketmaster, AT&T, Santander Group, Advance Auto Parts, Lending Tree and Neiman Marcus.

133. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the stock price dropped 3.39%, or $4.45 from a close of $131.21 per share on June 7, 2024 to $126.76 per share on June 10, 2024. Trading volume was 10.79 million shares, a sharp increase from ordinary daily numbers.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendant Scarpelli Has Admitted That He Followed Consumption on a Daily Basis

134. On June 27, 2023, the Company and key executives hosted an Investor Day presentation with investors and analysts. During the presentation, Defendant Scarpelli stated:

> In terms of what we've commented on in the call was literally the month of April kind of starting about day 10 or whatever is pretty much flat week-over-week growth in revenue. But coming into May and into June, **consumption** is back where we'd expect it to be. So **we look at it on a daily basis, week-over-week growth**.

(Emphasis added.)

135. In this statement, Defendant Scarpelli admitted that he tracked the Company's consumption figures on a daily basis. Indeed, Scarpelli stated that "we" would look at consumption figures on a daily basis, and so suggested that other senior executives, including Defendant Slootman, likewise tracked these figures on a daily basis and so were well aware of consumption trends and factors affecting those trends.

### B. Defendants Have Admitted That They Knew by August 2023 or Shortly Thereafter That Discounted Storage and the Availability of Iceberg Tables Were Negatively Impacting Revenue

136. During a presentation on March 5, 2024, in response to an analyst question regarding tiered storage pricing, Scarpelli admitted that Snowflake had begun to offer, and customers had begun to take advantage of, discounted storage pricing in Q3 2024. Scarpelli also made clear that the Company began to offer discounted storage pricing because he knew at that time that the same customers that would benefit from tiered storage pricing wanted to adopt Iceberg Tables.

> **Analyst:** [T]iered storage is one that I struggle with a little bit more to understand the impact. I don't know where our customers are today in terms of what tier and where they could potentially go to.
>
> **Defendant Scarpelli:** Yes. So historically, we have discounted a few of our very large customers in storage. We've renegotiated over the last few years our pricing with AWS, Google and Azure, such that we had a fair bit of margin in storage. That was never our intent to have rolled out what we call tiered storage pricing. It's only impacting our biggest customers. ***You have to spend a minimum of $1.2 million, I think, a year to get there. So all of our big customers have this now***. And the more you commit, the bigger the discount on storage you can get. ***And you're getting the full impact of that in Q1***. ***It started a little bit in Q3 and more towards the end of Q4 when customers sign contracts***. ***You're going to get the full benefit or impact of that this year, and that's factored in the guidance.***
>
> **Analyst:** Got it. So it's kind of like a volume discounting methodology for the largest customer.
>
> **Defendant Scarpelli:** Yes. ***I didn't see that much downside in doing it because most of those big customers are ones over time that want to go to Iceberg Tables anyway***.
>
> (Emphasis added.)

137. In this statement, Scarpelli made clear that "tiered storage pricing" "started a little bit in Q3." That is, Scarpelli admitted that, by the third quarter of fiscal year 2024 at the latest (*i.e.*, on or around August 1, 2023), he knew that the Company would have to begin giving discounts on storage to large customers and so knew, for example, that product gross margins for storage would therefore not "improve for the fiscal year ending January 31, 2024," as the Company had claimed.

138. Moreover, in stating that he "didn't see that much downside" in offering tiered storage discounts "because most of those big customers are ones over time that want to go to Iceberg Tables anyway," Scarpelli admitted that he knew by the third quarter of fiscal year 2024 at the latest (*i.e.*, on or around August 1, 2023), that the Company would have to give discounts on storage to try to convince customers not to end or cut back their storage through implementing Iceberg Tables.

### C. Defendants, the Board of Directors, and Senior Management Received Regular Reports on Cybersecurity Risks and Countermeasures

139. Defendants Slootman and Scarpelli and the Board of Directors received regular reports regarding cybersecurity risks. The Board of Directors included Defendant Slootman. In the Company's 2024 10-K, Defendants noted that the board of directors has "oversight responsibility with respect to the management of cybersecurity risks related to our products and services as well as our information technology and network systems." The 2024 10-K expressly noted that "management periodically provides cybersecurity briefings to the entire board of directors":

> Our board of directors has a cybersecurity committee of the board to assist it in fulfilling its oversight responsibility with respect to the management of cybersecurity risks related to our products and services as well as our information technology and network systems. The responsibilities of the cybersecurity committee include overseeing our implementation and maintenance of cybersecurity measures, data governance, and compliance with applicable information security laws. The cybersecurity committee receives reports from management concerning our significant cybersecurity threats and risk and the processes we have implemented to address them and has access to various reports, summaries or presentations related to cybersecurity threats, risk, and mitigation. In addition, our audit committee has oversight responsibility over our internal financial controls and our enterprise risk management program, including

disclosure controls related to cybersecurity. Finally, management periodically provides cybersecurity briefings to the entire board of directors.

140. Similarly, the 2024 10-K stated that "senior management and the audit committee of our board of directors receive reports on the key risks and the effectiveness of our management of such enterprise risks."

141. Accordingly, Defendant Slootman, as a member of the Board of Directors, had responsibility for overseeing cybersecurity risks, and they received regular cybersecurity briefings. Likewise, "senior management" (including presumably the CFO, Defendant Scarpelli) received reports on cybersecurity risks. In these ways, Defendants were fully aware of the Company's cybersecurity risks and its management of those risks, including the vulnerability of customer data housed at Snowflake to cyberattacks based on access credentials. Accordingly, Defendants knew that Snowflake did not "assume a majority of the responsibilities" for customer's cybersecurity as the Company had misrepresented. They also knew that the Company did not "maintain a cybersecurity program designed to identify, assess, and manage material risks from cybersecurity threats to . . . customer data," as they had assured investors. They knew that the Company's purported 'shared" responsibility model for cybersecurity was ineffective as many customers lacked the capability, knowledge and tools to secure their access credentials.

**D. Defendant Slootman Sold $223 Million of Stock Over 46 Days in Months Before the Disclosures at Issue**

142. Defendant Slootman had particular motive and the opportunity to commit securities fraud, as he had concealed his retirement plans and adjusted his Rule 10b5-1 stock sale plan within the Class Period to sell hundreds of millions of dollars of stock in a very short period before adverse facts were disclosed.

143. During the Class Period, on September 25, 2023, while Snowflake's business issues were being concealed, Slootman established a Rule 10b5-1 sales plan that triggered stock sales when prices hit certain parameters and that supercharged his personal stock sales in the weeks prior to his surprise retirement and negative revelations concerning Snowflake's consumption and storage trends. From publicly reported trading, it can be inferred that Slootman's plan was designed to sell a tsunami

of shares once Snowflake reached very high prices. After tepid personal stock sales in early 2023, under his new plan, Slootman sold approximately ***$223 million*** worth of Snowflake stock in only ***46 days***, including a $50 million sale made only 19 days before his retirement announcement. These sales occurred right before the Company disclosed devastating news about various business challenges, beginning with a conference call that shocked the market on February 28, 2024 (the same day Slootman announced his retirement). Slootman's late 2023 to early 2024 sales history under his Rule 10b5-1 plan, adopted September 25, 2023, was as follows:

| Transaction Date | Reported Date/Time | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount | Shares Owned |
|---|---|---|---|---|---|---|---|---|
| 2024-02-09 Sale | 2024-02-12 5:25 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 213,922 | $232.67 | $49,774,044 | 11,642,113 (Indirect Direct) |
| 2024-02-08 Sale | 2024-02-09 4:47 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 86,078 | $225.13 | $19,378,740 | 11,856,035 (Indirect Direct) |
| 2023-12-28 Sale | 2024-01-02 4:40 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 275,000 | $200.78 | $55,215,839 | 11,942,113 (Indirect Direct) |
| 2023-12-26 Sale | 2023-12-28 4:31 pm | Snowflake Inc. | SNOW | Slootman Frank CEO and Chairman | 500,000 | $197.29 | $98,645,995 | 23,637,477 (Indirect Direct) |

144. After having vehemently denied a *Business Insider* report in June 2023 that he was considering retirement, on February 28, 2024, CEO Slootman made a "surprise" announcement that he was retiring, effective the previous day.

145. Defendant Slootman's actions in setting up a new Rule 10b5-1 plan during the Class Period and selling over $200 million in stock in the company just before the disastrous February 28, 2024 disclosures are strong evidence of motive and scienter.

### E. Knowing and Addressing Grave Threats to the Business Is a Core Operation of Snowflake

146. As a SaaS provider specializing in cloud data storage, addressing grave cybersecurity threats to the business is a core operation of the Company—it would be absurd to suggest that Defendants were not aware of the existence and potential for such threats.

147. In its public statements, the Company touted that it was highly focused on mitigating cybersecurity threats, which it deemed to be a "material risk" to the company's business. The Company's 2024 10-K stated:

> Our security teams work with management to prioritize our risk management processes and ***mitigate cybersecurity threats, including those that may materially impact our business.*** Our assessment and management of material risks from cybersecurity threats ***is a key risk area within our enterprise risk management program***. ***Our Chief Information and Data Officer, Chief Information Security Officer, and EVP, Engineering are responsible for management of cybersecurity risk under our enterprise risk management program, and senior management and the audit committee of our board of directors receive reports on the key risks and the effectiveness of our management of such enterprise risks***. In addition, ***key cybersecurity risks are assessed as part of our internal audit program***. We have completed various security audits and certifications, including SOC 2 Type II, SOC 1 Type II, PCI-DSS, HITRUST, FedRAMP High, and ISO/IEC 27001.
>
> (Emphasis added.)

148. In this statement, Snowflake described cybersecurity as a "key risk area" that could "materially impact" Snowflake's business. Snowflake also explained that high ranking officials in the Company were responsible for "management of cybersecurity risk under our enterprise risk management program," and "senior management and the audit committee of our board of directors receive reports on the key risks and the effectiveness of our management of such enterprise risks." "Key cybersecurity risks" were also assessed "as part of our internal audit program." As noted above, Defendants, as senior management, received reports on the key risks and effectiveness of these risks, and were therefore specifically aware of and involved in any plans to address such risks.

149. Defendants were right to focus on mitigating cybersecurity risks—Snowflake's business would (and did) suffer tremendously if cyber attacks compromised customer data in Snowflake's custody. As Defendants noted in their risk disclosures (which nevertheless failed to disclose the true scope of the risk at issue):

> If we, our customers, or third-party service providers experience an actual or perceived security breach or unauthorized parties otherwise obtain access to our customers' data, our data, or our platform, our platform may be perceived as not

> being secure, our reputation may be harmed, demand for our platform may be reduced, and we may incur significant liabilities.

150. As cybersecurity attacks could pose serious damage to the Company, preventing such attacks was a core operation of Snowflake. Because preventing cybersecurity attacks was a core operation of the Company, Defendants were intimately familiar with the Company's cybersecurity operations and were aware of Snowflake's vulnerabilities to cybersecurity threats.

## X. CLASS ACTION ALLEGATIONS

151. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Snowflake common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, and directors and officers of Snowflake and their families and affiliates.

152. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of 2024, Snowflake had over 300 million shares of common stock outstanding, owned by hundreds or thousands of investors.

153. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants' statements and/or actions misrepresented material facts;

(c) Whether Defendants' statements and/or actions omitted material necessary facts in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements, actions, and/or omissions were false and misleading;

(e) Whether Defendants' misconduct impacted the price of Snowflake common stock;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damages sustained by Class members and the appropriate measure of damages.

154. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

155. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

156. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. PRESUMPTION OF RELIANCE

157. At all relevant times, the market for Snowflake common stock was an efficient market for, among other things, the following reasons:

(a) Snowflake common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b) As a regulated issuer, Snowflake filed periodic public reports with the SEC and the NYSE;

(c) Snowflake regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services; and

(d) Snowflake was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force

and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

158. As a result of the foregoing, the market for Snowflake common stock promptly digested current information regarding Snowflake from publicly available sources and reflected such information in the price of Snowflake common stock. Under these circumstances, all purchasers of Snowflake common stock during the Class Period suffered similar injury through their purchase of Snowflake common stock at artificially inflated prices and the presumption of reliance under the fraud-on-the-market doctrine applies.

159. Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to disclose material information as required by law. Plaintiffs and other Class members would not have purchased or otherwise acquired Snowflake common stock at artificially inflated prices if Defendants had disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153 (1972).

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### For violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

160. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases and trades of Snowflake securities during the Class Period.

163. The Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

164. The Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

165. As a result of the foregoing, the market price of Snowflake securities was artificially inflated or otherwise adversely affected during the Class Period. In ignorance of the falsity of the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Snowflake securities during the Class Period in purchasing Snowflake stock.

166. Had Plaintiffs and the other members of the Class been aware that the market price of Snowflake securities had been artificially and falsely inflated and adversely affected by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased Snowflake securities at the artificially inflated prices that they did, or at all, and would have taken measures to avoid their losses.

167. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases and trades of Snowflake securities during the Class Period.

168. This claim was brought within two years from when it reasonably could have been discovered and within five years from when the violations alleged herein occurred.

**COUNT II**
**For violation of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

169. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

170. During the Class Period, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

171. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

172. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which were disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Snowflake securities.

173. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

174. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations alleged herein.

175. This claim was brought within two years from when it reasonably could have been discovered and five years from when the violations alleged herein occurred.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B. Awarding Plaintiffs and members of the Class damages with interest;

C. Awarding Plaintiffs reasonable costs, including attorneys' fees; and

D. Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

**XIV. JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: August 14, 2026

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Austin Van*

Jeremy A. Lieberman (*pro hac vice* forthcoming)
Austin Van (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
avan@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Meitav Provident and Pension Funds Ltd. and Lead Counsel for the Class*

**LAW OFFICES OF DAVID N. LAKE, A PROFESSIONAL CORPORATION**

*/s/ David N. Lake*

David N. Lake (SBN 180775)
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 479-9990
david@lakelawpc.com

**THE PASKOWITZ LAW FIRM P.C.**
Laurence D. Paskowitz
97-45 Queens Boulevard, Ste. 1202
Rego Park, NY 11374
Tel: (212) 685-0969
Email: lpaskowitz@pasklaw.com

**LAW OFFICES OF BETH A. KELLER, P.C.**
Beth A. Keller
118 N. Bedford Rd., Ste. 100
Mount Kisco, NY 10549
Tel: (914) 752-3040
Email: bkeller@keller-lawfirm.com

*Counsel for Samantha Smith*